AYERS *v.* CITY OF ST. LOUIS

1. MUNICIPAL CORPORATIONS — CONTRACTS — ELECTRICITY — PURCHASE — CITY CHARTER.

 Contract under which defendant city purchased 90% of its electricity from defendant company did not violate a charter provision prohibiting defendant city from disposing in any way of any privilege belonging to its municipally-owned electrical utility unless approved by the electors even though contract was not submitted to electoral approval, where that contract did not prohibit defendant city from generating electricity, if it chose, and it was in fact operating its hydroelectric generating facilities to supply 10% of its requirements (St. Louis Charter, § 11.8).

2. MUNICIPAL CORPORATIONS—CONTRACTS—ELECTRICITY—ELECTIONS.

 Common council of home-rule city had the authority to contract for the furnishing of electric energy to that city without submitting that contract to the electors for approval (MCLA § 81.1 *et seq.*).

3. MUNCIPAL CORPORATIONS—CONTRACTS—ELECTRICITY—MANAGERIAL FUNCTION.

 City's contract with a private power company was an exercise of its managerial function in determining the best method of procuring electrical energy to distribute and to sell to its customers, and in so contracting the city did not dispose of any privilege belonging to its municipally-owned electrical utility.

Appeal from Gratiot, Leo W. Corkin, J. Submitted Division 3 December 2, 1969, at Grand Rapids. (Docket No. 6,611.) Decided December 9, 1969.

REFERENCE FOR POINTS IN HEADNOTES

[1–3] 38 Am Jur, Municipal Corporations § 567 *et seq.*

Complaint by James E. Ayers, Charles Rowley, Gordon Eff and Lemuel F. Rowley against the City of St. Louis, a municipal corporation, and Consumers Power Company, a Maine corporation, to have an electric service contract declared void and to enjoin defendant city from purchasing electric energy from defendant company. Summary judgment for defendants. Plaintiffs appeal. Affirmed.

*Tucker & Kubin,* for plaintiffs.

*T. Jefferson Hoxie,* City Attorney, and *Fortino, Plaxton & Moskal,* for defendant City of St. Louis.

*H. P. Graves* and *Snyder, Ewert, Ederer & Parsley (Jack C. Davis,* of counsel), for defendant Consumers Power Company.

Before: J. H. GILLIS, P. J., and McGREGOR and QUINN, JJ.

J. H. GILLIS, P. J. This is plaintiffs' appeal from an order of the circuit court for the county of Gratiot entering summary judgment in defendants' favor.[1] A review of the extensive briefs filed on appeal reveals no more definitive material than that available to the trial court upon defendants' motions. A similar review of the opinion of Honorable Leo W. Corkin, circuit judge, granting defendants' motions convinces this Court that Judge Corkin's opinion needs no expansion and that it adequately and accurately decides the case at hand. We accordingly incorporate it herein and adopt it as the opinion of this Court:

"Plaintiffs as residents, citizens, freeholders and taxpayers of the city of St. Louis, Michigan have

[1] Pursuant to GCR 1963, 117.2(3).

filed their amended complaint praying that a contract for electric service dated October 7, 1966 between the city and Consumers Power Company be declared null and void, and also seeking injunctive relief against the city to restrain the city from purchasing electric energy from Consumers as provided for in the October contract.

"Both plaintiffs and defendants have filed motions for summary judgment, there being no dispute as to facts.

"In an election held April 4, 1898 pursuant to § 2 of PA 1891, No 186,[2] a majority of the electors of the city of St. Louis voted in favor of the proposition of bonding the city for the purpose of constructing or acquiring by purchase works to supply the city and in [sic] inhabitants with electric lights. Shortly thereafter the city constructed such works; said works included generating facilities and a distribution system.

"The city has continued to operate its municipal electric utility up to the present time, adding to the generating capacity and distribution system, as required.

"The contract of October 7, 1966 with Consumers Power Company was entered into by the city pursuant to a resolution duly adopted by the common council of the city on September 6, 1966. In January, 1967, the city commenced to purchase electric energy from Consumers for resale by the city to electric customers served by the city's distribution system, and is presently purchasing such energy under the terms of the contract.

"As a result of purchasing electric energy from Consumers, it has not been necessary for the city to generate electric energy by use of its diesel engines and generators, but the city does continue to operate certain hydroelectric generating facilities and its distribution system. The diesel engines and generators are maintained, test operated, and are at all

---

2 CL 1948, § 123.92 (Stat Ann 1969 Rev § 5.2472).

times available to produce electric energy whenever the city government determines it to be in the best interest of the city to do so.

"The provisions of the contract between the city and Consumers pertinent to this suit would appear to be the following:

" '1. Energy to be furnished:

" 'Subject to the terms and conditions hereof, the city agrees to purchase and accept from the company, and the company agrees to supply and sell to the city, electric energy as auxiliary or standby to the city's electric generating plant which is used by the city to supply electric energy to its distribution system, but not in excess of 3,000 kilovolt-amperes, being the capacity reserved by the company for the city's use. The company will, at the written request of the city made at least thirty (30) days in advance, permit an increase in such reserved capacity provided the company has power available.

" '5. Equipment to be furnished:

" '(a) By the company:

" 'In addition to its said meters and metering equipment, the company shall furnish and maintain all transmission lines and other equipment for the delivery of energy to the point of delivery as described in § 3 hereof. The company, its agents and employees shall have full right of authority of ingress and egress at all times on and across the premises of the city for the purpose of constructing, operating, maintaining, replacing, relocating, repairing, moving and removing its said transmission lines and equipment. Said right of ingress and egress, however, shall not unreasonably interfere with the premises of the city.

" '(b) By the city:

" 'The city shall furnish, without cost to the company, a suitable site on the city's property for the company's said substation together with all necessary rights of way over the city's streets and property for the company's transmission lines from the city's corporate limits to said substation site. The

city shall also furnish and maintain, at its expense, all facilities beyond said point of delivery. The company shall have no obligation to inspect the city's said facilities nor have any responsibility with respect to the installation, repair, maintenance, replacement, relocation, removal or operation of said facilities.

" '6. Rate:

" 'The city agrees to pay for such electric energy delivered to it hereunder in accordance with the following rate, to-wit:

" 'Capacity charge:

" ' $2 per month per kva for the first 2,200 kva of billing demand,

" '$1.80 per month per kva for all over 2,200 kva of billing demand.

" 'Energy charge:

" '7 cents per kwh for the first 6,000,000 kwh used per month,

" '6 cents per kwh for all over 6,000,000 kwh used per month.

" 'Minimum charge:

" 'The capacity charge included in the rate, but in no case less than $3,000 per month.

" '8. Parallel operation:

" 'Permission is hereby given by the company to the city to operate the city's electric generating plant in parallel with the company's system. The city agrees to install and properly maintain suitable approved appliances and devices and to provide sufficient trained personnel to protect its equipment and service and the equipment and service of the company from injury or interruptions which might be caused by a flow of current from the company's lines to the city's connections or from a flow of current from the city's plant to the company's lines, and to assume any loss, liability or damage caused by a lack of such protection.

" 'The electric measuring instruments from which information is taken for billing purposes will be

equipped with ratchets or attachments to prevent a credit to the city for any current which its plant may generate and send back into the company's lines.

" '12.  Term:

" 'This agreement will extend for an initial term of 5 years from the 1st day of January, 1967 and from year to year thereafter until terminated by mutual consent or by either party giving the other at least 24 months' written notice of its desire to terminate the same at the expiration of said initial term or at the expiration of any yearly period thereafter.'

"Since entering into the contract the city has been purchasing approximately 90% of its electric energy requirements from Consumers, the remainder being generated by its own hydroelectric facilities.

"It is plaintiff's [*sic*] contention that the city by entering into the contract violated the provisions of the City Charter (§§ 11.1, 11.8) and PA 1891, No 186.[3]

"St. Louis is a home-rule city; its charter having been adopted November 3, 1942.

"The charter provisions called into question are as follows:

"Section 11.1 provides:

" 'The municipally owned utilities, that is, the electric light plant and the water department, together with any utilities hereafter acquired, shall be operated for the benefit of the city of St. Louis.'

"Section 11.8 provides:

" 'The city shall not sell, exchange, lease, or in any way alienate or dispose of the property, easements, or other equipment, privilege or asset (except income) belonging to and appertaining to any utility which it may acquire, or its parks, unless and except the proposition for such purpose shall first have been submitted at a regular or special election held for the purpose in the manner provided in this charter to the qualified voters of the city approved by them

---

[3] CL 1948, § 123.91 *et seq.* (Stat Ann 1969 Rev § 5.2471 *et seq.*).

by a three-fifths majority vote of the electors voting thereon. All contracts, negotiations, grants, leases or other forms of transfer in violation of this provision, shall be void and of no effect as against the city. The provisions of this section shall not, however, apply to the sale or exchange of any real estate which is not necessary to the operation of any utility or utility department or any articles or equipment of any city owned utility as are worn out or useless, or which could with advantage to the service be replaced by new and improved machinery or equipment.'

"Relying on *Clark* v. *City of South Haven* (1967), 8 Mich App 74, and *George* v. *The Wyandotte Electric Light Company* (1895), 105 Mich 1, [plaintiffs] argue that by reason of the contract with Consumers the city has alienated and disposed of the privilege to generate electric energy for a period of five years, at least up to 90% of its requirements. Apparently the monthly minimum charge results in the purchase of approximately 90% of the city's requirements. Also, by reason of the fact that the electors of the city voted to construct and operate a municipal electrical works, it is not within the power of the common council to circumvent this action by entering into the contract with Consumers.

"Defendants take the position that the common council of the city was vested with the authority and managerial discretion to enter into the contract with Consumers pursuant to PA 1891, No 186, and PA 1895, No 215,[4] and that no provision of the city charter was violated by the action of the city council in entering into the contract.

"The court agrees with defendants' contention that by reason of PA 1891, No 186 and PA 1895, No 215, * * * the common council of the city of St. Louis has the authority to contract for the furnish-

---

[4] MCLA § 81.1 *et seq.* (Stat Ann 1949 Rev § 5.1591 *et seq.*, as amended). See specifically MCLA § 107.8 (Stat Ann 1949 Rev § 5-.1902).

ing of electric energy to the city without submitting the contract to the electors for approval. However, that is not the sole issue presented by this case.

"In the recently decided case of *Clark* v. *City of South Haven* (1967), 8 Mich App 74, the factual situation was similar to this case. In *Clark* the city of South Haven entered into a contract with Indiana & Michigan Electric Company obligating the city to purchase from the company all of the electric capacity and energy the city would require for a period of ten years. Following the execution of the contract, motions or resolutions were adopted authorizing the city manager to incur financial obligations in connection with the 'mothballing' of the city's electric generating plant.

"Section 11.8 of the St. Louis City Charter is, in substance, the same as § 13.5 of the South Haven Charter. Also, both Saint Louis and South Haven are home-rule cities, and both had been operating a municipal electric plant for many years.

"Observing that the grant, right or privilege to generate electricity, in effect, came directly from the people, the Court found that by entering into the contract with the Indiana & Michigan Electric Company a major community asset had been rendered useless, unavailable and inoperative. While recognizing that the action of the South Haven City Council did not constitute a complete and final severance of the ties of ownership, the Court found that it did amount to one way of disposing of a privilege, because the city transferred its privilege of supplying power to the contracting utility contrary to the charter provision stating: 'or in any way dispose of any * * * privilege * * * belonging to * * * any municipally owned public utility.'

"The defendants contend that *Clark* is not controlling because of substantially different facts.

"The city of St. Louis did not contract for the supply of 100% of its electric energy needs for the term of the contract, although as a practical matter the minimum charge might result in the purchase

of approximately 90% of its needs at the present time.

"The contract between the city and Consumers contemplates the continued operation by the city of its hydroelectric generating facilities. In addition the contract provides at, paragraph eight, that the city has the right to operate the city's electric generating plant in parallel with the Consumers' system. There is also no contention that the city intends to "mothball' its electric generating facilities, but on the contrary, the contract contemplates that the city will maintain its electric generating facilities in good operating condition, conducting periodic test runs, to the end that such facilities will be available for use at such times as the city council may determine.

"Because of contractual differences as well as the difference in the actions of the cities of St. Louis and South Haven with respect to generating facilities after entering into the respective contracts, the court is of the opinion that the result reached in *Clark* is not controlling of the instant case.

"In *Clark* the Court was concerned about the fact that South Haven had contracted away its privilege to generate electric energy and rendered its generating facilities useless. The Court also stated that the words 'lease or in any way dispose of' indicates that even the disuse of a public utility for a term of years must be approved by the electorate.

"St. Louis has not contracted away its privilege of generating electric energy and is in fact operating its hydroelectric generating facilities. Although it might not be sensible from a cost standpoint, it can generate electric energy by means of diesels at any time it decides to do so. Also, the city has taken no action to render useless its diesel generating facilities, but rather maintains them in operating order so, at the very least, they are available for standby use. It should also be noted that the contract with Consumers is for a five year term plus optional additions with a specific limitation on the power to be supplied by Consumers on demand of the city.

"The court would conclude that in entering into the contract with Consumers the St. Louis council was exercising its managerial function in determining the best method of procuring the electrical energy to distribute and sell to its customers, and in doing so it did not dispose of any privilege belonging to its municipally owned utility.

"Plaintiffs' motion for a summary judgment is denied and defendants' motion for summary judgment is granted."

Our review and deliberations lead us to the same conclusions as the trial court.

Affirmed. Costs to defendants-appellees.

All concurred.

